

FILED
FEB 10 2022

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

IN THE MATTER OF THE SEARCH OF
Motorola Type M373B smart phone,
CURRENTLY LOCATED AT Dandridge
Police evidence room at 267 West Highway
25/70, Dandridge TN 37725

Case No. 3:19-MJ-1105

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, David Norton, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

I am a **Task Force Officer** (TFO) with the **FBI**, and have been since **February of 2017**. Your affiant has worked in the field of law enforcement for over twenty years.

I was employed by Gatlinburg Police Department from 1995 to 2009. I was assigned to the Drug Task force from Gatlinburg Police Department from 2007 to 2009. In 2009 I took a full time Agent position at the Drug Task force. In 2017 I became employed as a Deputy Sheriff with the Jefferson County Sheriff's Department. I am currently a Detective Sergeant at the Jefferson County Sheriff's Department and I am assigned to the 4th Drug Task Force (DTF) and to FBI HIDTA.

During my employment as a Police Officer, DTF Agent, Deputy Sheriff, and

FBI TFO, I have attended and completed various training schools and seminars dealing with drug investigative techniques. I have conducted or participated in thousands of investigations involving the distribution of narcotics in east Tennessee, which have been prosecuted in state court and Federal Court.

On hundreds of occasions, I have acted in an undercover capacity to purchase narcotics from individuals trafficking in methamphetamine, prescription pills, marijuana, cocaine, and other Controlled Substances in violation of the Drug Control Act of the State of Tennessee.

2.  I have executed and participated in the execution of a number of search warrants resulting in the seizure of illegal narcotics, financial records, documents indicating the accumulation, concealment, and utilization of proceeds along with actual monetary, other tangible assets and proceeds of illegal drug activity. I have participated in wiretap investigations, conducted surveillance of drug transactions, seized evidence, arrested suspects, interviewed suspects related to drug activity, interviewed confidential informants related to drug activity and conferred with prosecutors and other law enforcement officers in my community regarding narcotics investigations and, as a result, have gained considerable experience.

3.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

4.  The property to be searched is a Motorola type M373B Boost Mobile phone with a Sprint sim card # 8901120300 0065323905 SG10002A, hereinafter the "Device." The Device is currently located at Dandridge Police evidence room at 267 West Highway 25/70, Dandridge

2

TN 37725.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. On June 26, 2019 Joshua Shoemake ("SHOEMAKE") appeared to be texting while driving a blue Toyota Solara on US 441. The vehicle was traffic stopped by a Pigeon Forge Police Officer, Officer McCarter. Officer McCarter asked SHOEMAKE for his drivers' license, registration and proof of insurance. SHOEMAKE told Officer McCarter he had left his wallet at Taco Bell and provided a false name of Stephen Ryans, a false date of birth, and false social security number. Officer McCarter checked the information with his dispatch. The dispatch officer advised Officer McCarter nothing came back in the State of Tennessee with that information. A K-9 officer was called to the scene and conducted a free air sniff around the vehicle. The K-9 alerted on the vehicle to the odor of narcotics. Upon searching the vehicle police officers found an ID that belonged to Joshua SHOEMAKE. The picture and description on the ID matched the driver of the vehicle and SHOEMAKE was placed under arrest. A small black safe was found inside the vehicle behind the front passenger seat. Officers secured the key ring to the car from SHOEMAKE and attempted to unlock the safe by trying the other key on the key ring. Officers were able to unlock the safe with the keys (see below image captured by Pigeon Forge Police Department from the June 26, 2019 traffic stop).



Inside the safe, officers found two large clear baggies containing a crystal like substance believed to be methamphetamine. Officer McCarter conducted an additional check with his dispatch with SHOEMAKE's true identification and learned SHOEMAKE had an active warrant in Sevier County, Tennessee. The suspected methamphetamine was weighed at the police department and the total weight was 116.9 grams. The other passengers in the car were learned to be Mr. Charles Baxter ("BAXTER") and Ms. Virginia Wilbourne ("WILBOURNE"). Both BAXTER and WILBOURNE had active warrants and were placed into custody. The Toyota Solara was towed to an impound lot and kept in police custody. BAXTER agreed to cooperate with police and spoke with Officer Mashburn, Pigeon Forge Police Department. BAXTER requested Officer Mashburn get his phone out of the vehicle that had been impounded. On June 30, 2019, Officer Mashburn removed two cell phones from the vehicle. When Officer Mashburn got to the jail to meet with BAXTER, he learned that BAXTER posted bond and Officer Mashburn had no way of contacting him. Officer Mashburn placed both phones into evidence.

4

At a later time, SHOEMAKE contacted Officer Mashburn via telephone and requested his phone that had been left in the vehicle be returned to him. Officer Mashburn asked SHOEMAKE to describe the phone and SHOEMAKE quickly hung up the phone call. Officer Mashburn inspected the phones and was able to determine which phone belonged to BAXTER and which phone belonged to SHOEMAKE based upon the phones' home screens. Officer Mashburn did not further search either phone. The phone determined to belong to SHOEMAKE was turned over to Det. Kenny Lodwick with Dandridge Police Department. SHOEMAKE previously worked as a confidential source for Officer Mashburn. SHOEMAKE began working as a confidential source on April 27, 2017 and was able to complete a between 6 to 8 drug transactions. After two months as a confidential source, SHOEMAKE went inactive and no longer communicated with law enforcement. When SHOEMAKE arranged controlled purchases for Officer Mashburn during mid-2017, SHOEMAKE would use his phone to arrange the controlled purchases of narcotics. After the arrest of SHOEMAKE on June 26, 2019 and after SHOEMAKE posted bond, your affiant had a confidential source contact SHOEMAKE on his new phone to arrange a controlled purchase. This controlled purchase did not take place because of a third party not showing up to supply SHOEMAKE with the drugs to sell to the confidential source. However, the communications attempting to arrange the controlled purchase were via phone.

7. The Device is currently in the lawful possession of the Dandridge Police Department. It came into the Dandridge Police Department's possession in the following way: Detective Kenneth Lodwick of the Dandridge Police Department learned that SHOEMAKE had been arrested by the Pigeon Forge Police Department for possession of methamphetamine for

5

resale on June 26, 2019. Detective Lodwick contacted the Pigeon Forge Police Department about adopting the case to be included into an ongoing investigation that is a potential federal case. Your affiant and Detective Lodwick are investigating a methamphetamine distribution conspiracy that includes SHOEMAKE and other co-conspirators. The case has not yet been indicted. Pigeon Forge Police Department agreed to turn over the case reports and evidence to Detective Lodwick. Included in the evidence turned over to Detective Lodwick was a Motorola Boost Mobile smart phone that had been seized as evidence from the vehicle driven by SHOEMAKE on June 30, 2019. Therefore, while the Dandridge Police Department might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

8. The Device is currently in storage at Dandridge Police Department 267 West Highway 25/70 Dandridge TN 37725. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Dandridge Police Department.

9. Based on my training and experience, individuals that deal in illegal drugs often use phones to arrange illegal drug sales; using voice calls, text messages and social media. Individuals often take photographs of evidence of illegal drugs and illegal activity. Joshua SHOEMAKE's phone should contain contact information of his drug suppliers, contact information of his drug customers, call logs of coconspirators, text messages arranging illegal drug sales, and photographs of illegal activity and evidence of crimes.

6

# TECHNICAL TERMS

10. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by

7

connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal

9

computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

11. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as **a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.** In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

12. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

13. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

11

b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

14. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

15. *Manner of execution.* Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

16. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*David Norton*

David Norton
Task Force Office
FBI

Subscribed and sworn to before me
on October 4, 2019:

*Debra C Poplin*

Hon Debra C. Poplin
UNITED STATES MAGISTRATE JUDGE

13

# ATTACHMENT A

17. The property to be searched is a Motorola Type M373B Boost Mobile phone, Sprint sim card number 89011203000065323905SG10002A, hereinafter the "Device." The Device is currently located at Dandridge Police evidence room at 267 West Highway 25/70, Dandridge TN 37725.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of 21 U.S.C. 846, 841(a)(1), and 841(b)(1)(A) and involve **Joshua Shoemake** since **May 26, 2019**, including:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording **Joshua Shoemake**'s schedule or travel from **May 26, 2019** to the present;

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.